*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0056**

In the Matter of the Civil Commitment of: Gary George Spicer.

**Filed June 15, 2015
Affirmed
Hudson, Judge**

Sherburne County District Court
File No. 71-PR-13-8

Lori Swanson, Attorney General, John D. Gross, Assistant Attorney General, St. Paul, Minnesota (for respondent state)

Ryan B. Magnus, Jennifer Thon, Jones and Magnus, Mankato, Minnesota (for appellant)

Considered and decided by Hudson, Presiding Judge; Worke, Judge; and Smith, Judge.

# U N P U B L I S H E D   O P I N I O N

**HUDSON**, Judge

The district court ordered that appellant be civilly committed as a sexually dangerous person (SDP) and sexually psychopathic personality (SPP). We concluded that the district court's findings lacked particularity and reversed and remanded to the district court for further findings and consideration of whether appellant met the criteria for commitment as SDP and SPP. *In re Civil Commitment of Spicer*, 853 N.W.2d 803 (Minn. App. 2014). On remand, the district court again granted the petition for civil commitment. Appellant challenges the district court's amended order, arguing that the

district court's amended findings of fact again lack particularity and that the evidence is insufficient to justify civil commitment. We affirm.

## FACTS

In 2005, appellant Gary George Spicer pleaded guilty to fifth-degree criminal sexual conduct and attempted fifth-degree criminal sexual conduct, after he admitted that he sexually assaulted his stepdaughter, R.S., and that he attempted to sexually assault another stepdaughter's friend. The district court imposed jail sentences for each offense, but stayed imposition of those sentences and placed appellant on probation, with the following terms: (1) that he serve 60 days in jail; (2) that he not possess alcohol or non-prescribed controlled substances; (3) that he complete sex offender treatment; and (4) that he have no unsupervised contact with minor females.

Appellant began sex offender treatment in September 2005. A few months later, he informed his group that he had begun living with a minor child, E.R., and her mother. E.R. was autistic and had an I.Q. of 48. Treatment staff informed appellant that he needed to change his living situation or be terminated from treatment. Appellant chose to be terminated from treatment but was readmitted a month later because E.R. and her mother had moved away.

Appellant continued to participate in treatment for approximately three more years. He was terminated from treatment in June 2008 because he disclosed to treatment providers that he continued to have monthly contact with E.R. and contact with other minor children. Appellant's probation agent filed a violation report, and appellant served additional jail time. After his release, appellant was readmitted into treatment, on the

2

condition that he not contact E.R., her mother, or other family members without his probation agent's consent.

In December 2008, appellant was again terminated from treatment after he informed his treatment providers that he continued to have contact with E.R.'s mother and that he intended to marry her. He married E.R.'s mother a few weeks later and served additional jail time for his failure to complete treatment. After he was released, he moved back in with E.R. and her mother. Appellant began to fantasize about E.R. and subsequently offended against her on multiple occasions. E.R.'s mother reported appellant's conduct to law enforcement, and appellant was charged with third- and fourth-degree criminal sexual conduct. Appellant later pleaded guilty to fourth-degree criminal sexual conduct and received a 24-month prison sentence. The district court ordered that appellant be evaluated for civil commitment prior to his release from prison. A petition was filed to commit appellant as an SDP and SPP in January 2013.

At the subsequent civil commitment trial, appellant testified about other incidents of abuse for which he was not criminally prosecuted. He admitted that on more than ten occasions, he engaged in sexual contact with another stepdaughter, T.S., that he touched the breast of T.S.'s friend, J.K., and that he had engaged in additional sexual contact with R.S. The district court also heard testimony and received reports from three psychologists: Dr. Thomas Alberg, Dr. Mary Kenning, and Dr. Peter Marston. Each expert evaluated appellant's risk of reoffending by using several different psychological assessments, including the Static-99R actuarial assessment in conjunction with the SRA-FV assessment. The experts testified that those assessments determine an individual's

likelihood of reoffending based on certain static and dynamic risk factors and indicated that, based on the Static-99R assessment, appellant presented a 24 percent chance of reoffending over the remainder of his life. Based on that result, Dr. Kenning opined that appellant's risk of reoffending was no higher than 24 percent.

Dr. Alberg and Dr. Marston testified, however, that appellant's likelihood of reoffending was greater than 24 percent. Dr. Alberg stated that the risk assessment tools did not accurately predict appellant's risk of reoffending because those tools did not account for his failure to comply with the terms of his probation, his inability to self-regulate, and the general instability in his life. He also noted that those tools considered appellant to be a low risk to reoffend following his 2005 convictions but that appellant reoffended against E.R. anyway. Dr. Marston reported that appellant's risk of reoffending should be increased to account for his "multiple paraphilias."

The district court found Dr. Alberg and Dr. Marston to be more credible than Dr. Kenning, determined that the evidence satisfied the criteria for commitment as an SDP and SPP, and ordered that appellant be committed indefinitely. We reversed and remanded for the district court to make more particularized findings. On remand, the district court issued amended findings of fact and conclusions of law and again ordered that appellant be civilly committed. This appeal follows.

## DECISION

A person may be civilly committed if the petitioner proves the statutory criteria by clear and convincing evidence. Minn. Stat. § 253D.07, subd. 3 (2014). "Clear and convincing evidence is evidence that is more than a preponderance of the evidence but

4

less than proof beyond a reasonable doubt." *State v. Jones*, 753 N.W.2d 677, 696 (Minn. 2008) (quotation omitted). An SDP is defined as a person who (1) has engaged in a course of harmful sexual conduct; (2) has manifested a sexual, personality, or other mental disorder or dysfunction; (3) and as a result, is likely to engage in acts of harmful sexual conduct. Minn. Stat. § 253D.02, subd. 16 (2014). Commitment as an SPP requires that a person has exhibited a "habitual course of misconduct in sexual matters, an utter lack of power to control the person's sexual impulses and, as a result, is dangerous to other persons." Minn. Stat. § 253D.02, subd. 15 (2014).

We review a district court's factual findings on the elements of the civil-commitment statutes for clear error. *In re Civil Commitment of Stone*, 711 N.W.2d 831, 836 (Minn. App. 2006), *review denied* (Minn. June 20, 2006). "Where the findings of fact rest almost entirely on expert testimony, the [district] court's evaluation of credibility is of particular significance." *In re Knops*, 536 N.W.2d 616, 620 (Minn. 1995). But whether the evidence is sufficient to meet the statutory requirements for commitment is a question of law, which we review de novo. *In re Civil Commitment of Martin*, 661 N.W.2d 632, 638 (Minn. App. 2003), *review denied* (Minn. Aug. 5, 2003).

## I

Appellant first argues that the district court's amended findings of fact, conclusions of law, and order for commitment do not comply with our directives on remand. We previously reversed the district court's first commitment order for lack of particularized findings and remanded to the district court for additional findings and "further consideration of the issues relevant to the county's claims that [appellant] is an

5

SDP and an SPP." *Spicer*, 853 N.W.2d at 813. We identified three issues with the district court's order: (1) that many of the district court's findings of fact were not "true findings"; (2) that the district court adopted "*in toto*" expert opinions regarding disputed issues without resolving discrepancies between those experts; and (3) that the district court's finding of facts were not meaningfully tied to its conclusions of law. *Id*. at 810–12.

We are troubled, following remand, that because many of the amended findings still consist primarily of recitation of the trial testimony and other evidence, there are still few findings of fact that can be characterized as true findings for our review.[1] Likewise, we are also concerned that the district court again failed to make specific findings regarding the credibility of conflicting expert testimony that it relied on to reach its conclusions of law. Nevertheless, we conclude, for several reasons, that the amended order is sufficiently particular to permit meaningful appellate review.

First, we note that most of the district court's non-specific findings are regarding issues that are not disputed by the parties. For example, several of the district court's findings relate to witness testimony regarding the incidents that formed the basis for appellant's criminal convictions, his employment history, and his relationship history. We also note that some of the district court's findings relate only to the procedural history of the case. Because appellant does not challenge those findings on appeal, we

---

[1] We are sympathetic to the burden placed on the district court in these matters, where the parties submit hundreds of proposed findings of fact, and the documentary evidence is substantial. But meaningful appellate review is possible only when the district court's order identifies the facts it determined to be true and the "facts on which the district court's decision is based." *Spicer*, 853 N.W.2d at 811.

6

conclude that the district court's failure to make true findings on those issues does not preclude meaningful appellate review.

Second, regarding the disputed issues on appeal, the district court's amended order contains several particularized findings that do clarify the relevant evidence that it relied on to assess whether appellant met the statutory criteria for commitment. For example, regarding the psychological assessments performed on appellant, the district court found that those tools had "inherent limitations" that must be balanced against individual factors to assess the risk of re-offense. The district court also found that appellant's release plan, which included a "life of solitude" near his young grandchildren, indicated a high likelihood of re-offense because it was similar to "the present and future contexts in which [appellant] used violence." The district court also found significant the fact that appellant's level of reoffending escalated after he was discharged from treatment and that appellant ignored the advice of treatment providers by marrying E.R.'s mother. Those findings adequately describe the evidence the district court found persuasive, as well as establish what testimony the district court relied on to support its conclusions of law.

Finally, we are satisfied that meaningful appellate review is possible because the district court's amended order adequately ties its findings of fact to its conclusions of law. We previously expressed concern that the district court's first order did "not explain what evidence the district court found most persuasive or least persuasive, which facts the district court found to be most important or least important, or which *Linehan* factors were most significant in the ultimate resolution of the case." *Id.* at 811. But on remand the district court conducted an extensive evaluation of the *Linehan* factors in its

7

conclusions of law. The district court explained what factors it found to be persuasive, indicated what evidence it relied on in support of those factors, and weighed those factors to determine whether appellant meets the statutory criteria for commitment. For those reasons, we conclude that the district court's order sufficiently complies with our directives on remand and that the amended order is particularized enough to permit appellate review.

## II

Appellant next argues that the evidence is insufficient to satisfy the third factor of the SDP statute, whether he is a person "highly likely" to reoffend by engaging in acts of harmful sexual conduct in the future. *See In re Civil Commitment of Ince*, 847 N.W.2d 13, 22 (Minn. 2014). When determining whether a person is highly likely to reoffend, a district court must engage in a "multi-factor analysis," including consideration of the following six factors, known as the *Linehan* factors:

> (a) the person's relevant demographic characteristics (*e.g.,* age, education, etc.); (b) the person's history of violent behavior (paying particular attention to recency, severity, and frequency of violent acts); (c) the base rate statistics for violent behavior among individuals of this person's background (*e.g.,* data showing the rate at which rapists recidivate, the correlation between age and criminal sexual activity, etc.); (d) the sources of stress in the environment (cognitive and affective factors which indicate that the person may be predisposed to cope with stress in a violent or nonviolent manner); (e) the similarity of the present or future context to those contexts in which the person has used violence in the past; and (f) the person's record with respect to sex therapy programs.

*Id.* at 22–23 (quoting *In re Linehan,* 518 N.W.2d 609, 614 (Minn. 1994) (*Linehan I*)). The multi-factor analysis may include other relevant evidence outside those factors, including the actuarial and other psychological assessments used by the expert witnesses. *Id.* at 24. But district courts must "be wary of the potential factor repetition that can result from considering the *Linehan* factors in addition to multiple actuarial assessments that use different approaches based on factors that are the same as or similar to the *Linehan* factors." *Id.*

Here, the district court analyzed each of the six *Linehan* factors and considered the results of the various assessment tools used to determine appellant's risk. The district court determined that a majority of the *Linehan* factors indicated that appellant was highly likely to reoffend. We conclude that the district court's assessment of the six *Linehan* factors is supported by the record.

First, regarding appellant's demographic characteristics, the district court determined that appellant's age did not diminish his risk because he had already reoffended at an age where risk should have been reduced and that his gender, antisocial behavior, and relationship history also increased his risk of reoffending. This is supported by both the testimony and reports of Dr. Alberg and Dr. Marston, both of whom indicated that appellant's age should not weigh against his risk of reoffending because he had previously reoffended at an age when his risk was reduced. The same experts also indicated that appellant's gender and unstable relationship history indicated an increased risk of reoffending.

Second, the district court determined, regarding appellant's history of violent behavior, that though it found Dr. Marston's opinion credible that appellant's conduct constituted "de facto violence," it did not consider this factor to be applicable in its consideration of whether appellant was highly likely to reoffend. The district court's decision to give little weight to that factor was well within its discretion, as we do not second-guess the weight the district court chooses to place on the evidence. *Knops*, 536 N.W.2d at 620.

Third, the district court determined that the base-rate statistics, actuarial studies, and other psychological assessment tools used here were of little persuasive value to its analysis, noting that appellant reoffended after many of those tools indicated that he previously presented a low risk to others.[2] The district court noted that those tools did not consider all of the information necessary to assess appellant and that certain tools, including the SRA-FV, were relatively new and still being evaluated in the field. That analysis is also supported by the record. Dr. Marston explained that actuarial tools, though quite useful, are limited because they do not account for all relevant "person-based factors." Dr. Marston also expressed concern regarding the incorporation of dynamic risk factors through the SRA-FV, stating that the SRA-FV was a relatively new development in the field.

---

[2] We note that the third *Linehan* factor contemplates analysis only of base-rate statistics, which provide recidivism rates for a particular class of offenders. *Ince*, 847 N.W.2d at 22 n.3. In contrast, actuarial assessment tools, which measure the overall risk presented by a particular individual, are not a part of the *Linehan* factors, though they may be relevant to a district court's analysis regarding a person's likelihood to reoffend. *Id.* District courts should therefore be cautious in their analysis of those tools, to ensure that those tools are not double-counted in their analysis.

Regarding the fourth factor, the sources of stress in appellant's environment, the district court noted that appellant's plan upon release was to "live a life of solitude," but that the evidence demonstrated that loneliness was a "persistent triggering factor" for appellant's offenses. The district court also noted that appellant would be presented with new sources of stress, including his designation as a predatory offender and potential problems with employment. Appellant admitted in his own testimony that he offended as a result of feeling isolated. Dr. Alberg expressed concern that appellant might struggle financially and that his release plan required his family to establish realistic boundaries regarding his contact with children. Thus, the district court's analysis of this factor is supported by the record.

Fifth, the district court expressed concern with the similarity of the present or future context with those contexts in which appellant previously offended. The district court explained that appellant continued to put himself in positions where he was likely to reoffend and that his current release plan would result in him living under the same circumstances that led to his reoffending. That analysis is also supported by appellant's testimony. He admitted that when he was released from prison, he moved in with E.R. and E.R.'s mother, despite being warned by treatment staff that this would constitute a "high-risk" situation for him. He also testified that he sought out relationships when he became lonely and that he took no action to remove himself from E.R.'s home when he began to fantasize about E.R. And now, appellant indicates that, if released, he will live alone, near his son and grandchildren. The district court's determination that appellant's

11

release plan is similar to those circumstances in which appellant previously offended is supported by the record.

Finally, regarding the sixth factor, appellant's participation in sex offender treatment, the district court determined that this factor supported commitment because appellant was unable to complete treatment and because he subsequently reoffended after ignoring the recommendations of his treatment providers. The record supports the district court's analysis. As previously discussed, appellant admitted that he was terminated from treatment on multiple occasions and that he offended against E.R. after ignoring warnings from his treatment providers regarding his living arrangements with her and her mother.

In sum, the district court concluded that four of the *Linehan* factors supported confinement, that one was not applicable to appellant, and that base rate statistics and psychological assessments did not serve as accurate predictors of appellant's risk of reoffending. The district court also found Dr. Marston's and Dr. Alberg's opinions, which indicated that appellant was highly likely to reoffend, to be more credible and persuasive than Dr. Kenning's opinion. Because the district court's analysis is supported by the record, we conclude that the district court did not err in determining appellant to be an SDP.

Appellant also contends that the district court erroneously relied on the opinions of Dr. Marston and Dr. Alberg. He argues that those opinions and the district court's subsequent analysis are flawed because they engaged in "factor repetition" by increasing appellant's risk level based on factors that were already considered by the psychological

assessment tools. He also maintains that analysis of the *Linehan* factors constitutes factor repetition because several of those factors "are accounted for and appropriately weighed within the actuarial and dynamic risk assessment measures." Appellant claims that his Static-99R and SRA-FV scores, which indicate that he has a 24 percent chance of reoffending, are the most accurate predictors of his likelihood of reoffending.

We disagree. Appellant's argument essentially requires that this court conduct its own evaluation and analysis of the evidence presented at trial. But as noted previously, we do not second guess the weight and credibility that the district court gives to the evidence. *Knops*, 536 N.W.2d at 620. Because the district court's analysis of the *Linehan* factors is supported by the record, appellant's argument must fail.

Moreover, appellant's contention is inconsistent with Minnesota Supreme Court precedent. The supreme court recently reaffirmed the applicability of the *Linehan* factors and stated that district courts are required to consider those factors, despite the potential for "factor repetition" when those factors are considered in addition to actuarial assessments. *Ince*, 847 N.W.2d at 24. The court explained that though actuarial assessments are a relevant portion of the "multi-factor analysis for dangerousness prediction," those assessments do not outweigh or replace the validity of the *Linehan* factors because "the dangerousness prediction" is not "simply a matter for statisticians." *Id*. at 23–24 (quotations omitted). As a result, the district court is free to consider actuarial and non-actuarial evidence and draw conclusions from that evidence as it sees fit. *Id*.; *see also In re Civil Commitment of Navratil*, 799 N.W.2d 643, 649 (Minn. App.

2011)*, review denied* (Minn. Aug. 24, 2011) (concluding that the district court did not err by discounting statistical evidence when valid reasons existed to do so).

Finally, we conclude that, based on our review of the record, the district court did not engage in the sort of factor repetition that would prejudice appellant. The district court expressly declined to place significant weight on psychological assessment or actuarial tools and instead focused its analysis on the *Linehan* factors, ensuring that it would not "double-count" factors that were also considered by the psychological evaluations. The district court explained that, although those tools considered factors similar to *Linehan*, those tools did not properly account for circumstances specific to appellant's individual risk.[3] Because the district court's analysis of the *Linehan* factors is supported by the record, and because the district court did not engage in factor repetition, we conclude that the district court properly ordered that appellant be committed as an SDP.

## III

Appellant finally argues that the district court erred by committing him as an SPP because the evidence is insufficient to establish that he has an "utter lack of power" to control his sexual impulses. Minn. Stat. § 253D.02, subd. 15. Generally, when considering whether a person has an utter lack of power to control his sexual impulses, the district court is to consider the nature and frequency of the sexual assaults, the degree of violence involved, the offender and victim's relationship, the offender's attitude and

---

[3] For example, the district court noted that though actuarial tools lowered appellant's risk of reoffending because of his age, expert witnesses testified that appellant had already reoffended at an age when his risk was expected to be low.

mood, the offender's medical and family history, the results of psychological and psychiatric testing and evaluation, and other factors that bear on the offender's predatory sex impulse. *In re Blodgett*, 510 N.W.2d 910, 915 (Minn. 1994). The district court may also consider the person's lack of insight into his or her behavior, failure to address chemical dependency issues, history of flight, and refusal of sex-offender treatment. *In re Pirkl*, 531 N.W.2d 902, 907 (Minn. App. 1995), *review denied* (Minn. Aug. 30, 1995); *In re Irwin*, 529 N.W.2d 366, 375 (Minn. App. 1995), *review denied* (Minn. May 16, 1995); *In re Bieganowski*, 520 N.W.2d 525, 529–30 (Minn. App. 1994), *review denied* (Minn. Oct. 27, 1994).

Here, the record establishes that appellant offended against multiple victims, including his stepdaughters, on numerous occasions and that the severity of his offending increased over time. He failed to comply with his treatment plan or remove himself from situations where he was informed that he faced a high risk of reoffending. Two of the three expert witnesses indicated in their reports and testimony that appellant's behavior demonstrated an utter lack of power to control his sexual impulses.

Appellant's own testimony also demonstrates that he possesses an utter lack of ability to control his own sexual impulses. He testified that his offending against T.S. was "terrible" and "wrong, "and stated that he "didn't want to hurt her," but admitted that he sexually abused her for two years when she was a toddler and that he later offended against her when she was a teenager. He also testified that he offended against R.S. because he "had trouble controlling [his] actions" and that he did not use his escape plan to avoid offending against E.R. "because [he] wanted to satisfy [himself]." We conclude

15

that the district court did not err in concluding that the evidence clearly and convincingly warrants commitment as an SPP.

**Affirmed.**